IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:26-CR- 21 |
| v. | 26 U.S.C. § 7206(1)<br>Subscribing to a False Tax Return |
| KEVIN ALPHONSO STARLINGS, | (Count 1) |
| *Defendant*. | 18 U.S.C. § 1343<br>Wire Fraud<br>(Count 2) |
| | Forfeiture Allegation |

**CRIMINAL INFORMATION**

THE UNITED STATES CHARGES THAT:

**INTRODUCTORY ALLEGATIONS**

At all times relevant and material to this Criminal Information:

1. The defendant, KEVIN ALPHONSO STARLINGS, was a resident of the Eastern District of Virginia.

2. The defendant was the sole owner and operator of several businesses incorporated in the Commonwealth of Virginia, including Jeremiah Enterprises, Starlings Enterprises, The Service Sharks, ProSource Property Solutions, and Jeremiah Entertainment LLC (collectively "the defendant's companies"). The defendant's companies purported to provide a variety of services including property management, cleaning, and party supplies such as bounce houses.

3. As part of his operation of these businesses, the defendant designated himself as a W-2 employee who received wages from these companies.

### *Individual Federal Income Tax Returns*

4.  The Internal Revenue Service ("IRS") is an agency of the United States Department of Treasury responsible for administering the federal tax laws of the United States and for the collection of taxes owed to the United States.

5.  The defendant's companies were required under the Federal Insurance Contribution Act ("FICA") to withhold Medicare and Social Security taxes from any employees' wages, including the defendant's wages. The IRS also required the defendant's companies to withhold federal income taxes from any employees' wages, including the defendant's wages.

6.  The defendant's companies, as employers whose annual liability for trust fund taxes were each greater than $1,000, were required by law to file an Employer's Quarterly Federal Tax Return ("Form 941") reporting their employment taxes for each quarter. The Form 941 was due to the IRS at the end of the month following the end of each calendar quarter.

7.  The defendant's companies were required by law to deposit the withheld federal income taxes, Medicare, and Social Security taxes with the IRS from the quarterly filings.

8.  Every employer must have at least one person with the obligation to collect, account for, and pay over trust fund taxes. Such persons are called "responsible persons." As the sole owner and operator of the defendant's businesses, the defendant was the responsible person obligated to withhold trust fund taxes and federal income taxes from his own wages and account for and pay over those taxes to the IRS.

9.  The defendant generated and issued Form W-2s, Wage and Tax Statement, from his five businesses to himself, reflecting the wages, tips, and other compensation he was paid, and

the trust fund taxes and federal income tax that was purportedly withheld and paid over to the IRS on his behalf. The defendant used these W-2s to prepare his personal federal income tax returns.

10. IRS Form 1040, U.S. Individual Income Tax Return ("Form 1040") was used by United States taxpayers, including the defendant, to file an annual income tax return.

### *Small Business Administration*

11. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disaster.

### *Virginia Unemployment Insurance*

12. Unemployment insurance ("UI") is a joint state-federal program intended to provide temporary financial assistance to unemployed workers under certain circumstances. The federal unemployment trust fund provides support and funding for state UI programs. For instance, during periods of high unemployment, the federal government provides partial funding to states for payment of extended benefits to UI recipients. States can also borrow from the federal UI fund if their own funds are insufficient. While all states follow the same guidelines established by federal law, each administers its own separate UI program.

13. Unemployed workers in the Commonwealth of Virginia can file for unemployment benefits either by phone or through the VEC online portal. The VEC internet portal captures the IP address used by an applicant to log into their account, whether to file an initial claim or to conduct weekly recertifications.

14. To be eligible for Virginia unemployment benefits, claimants must have had their hours reduced by their employer or been separated from employment altogether. The VEC application for a UI claim requires the entry of the applicant's personally identifiable information ("PII"), including name, date of birth, Social Security number, physical address, and phone number. It also requires answering a series of questions to verify eligibility, such as work history, name of the employer, reason for separation, and that the applicant is ready, willing, and able to work. In addition, as an extra verification step, the applicant could choose to answer a security question.

15. Once the VEC approves a claim, the claimant must re-certify unemployment status on weekly basis. Claimants also must certify that they are ready, willing, and able to work each day during the weeks they are claiming unemployment benefits. Both initial applications and weekly recertifications are attested to as truthful under penalty of perjury.

16. VEC processed unemployment insurance applications and recertifications on its server located in Sandston, Virginia, in the Eastern District of Virginia. Following the submission of either an initial claim application or weekly recertification, the online system employed by the VEC evaluated the claim to make sure there were no holds on the claim. Once VEC approves an unemployment claim, VEC arranged payment to the claimant in the manner selected by the claimant—either a prepaid debit card or a deposit directly into their bank account.

17. If the claimant requested a debit card through which to access and spend the unemployment funds, Conduent Business Solutions, LLC, a VEC contractor, created a "Way2Go" MasterCard debit card the claimant could use to access the unemployment funds. Comerica Bank, which is headquartered in Dallas, Texas, provided the VEC-issued funds accessed through the

Way2Go card. Conduent mailed the Way2Go card via the United States Postal Service ("USPS") to an address designated by the claimant. If an applicant requests a replacement Way2Go card, they have the option of requesting expedited delivery, which is accomplished by sending the new card through Federal Express or the United Parcel Service. The prepaid debit cards are automatically reloaded with newly disbursed funds via electronic fund transfers using the internet.

18. Once the VEC was determined that a payment was authorized for a Way2Go card user, VEC would automatically send the "demographic file" on a daily basis via a secure SFTP file transfer connection through their servers located in Sandston, Virginia to Conduent servers located in Sandy, Utah, for the purposes of creating a new unemployment insurance claimant account (for initial claims) and to also designate funding for both new and existing claimant accounts.

19. Alternatively, the claimant could request that the unemployment funds be deposited directly into a bank account designated by the claimant through an ACH (Automated Clearing House) transfer. Once the VEC determined that a payment was authorized for a bank account user, VEC would send a record of all payments needed from the VEC server in Sandston VA to a Suntrust/Truist Bank server located in Atlanta, Georgia, instructing Truist or SunTrust to move money from the VEC Trust Fund account to a VEC Payments Account. Suntrust/Truist then created electronic transfers through ACH to the claimant direct deposit account on file which has been detailed on the originating ACH file.

20. In March 2020, the coronavirus ("COVID-19") pandemic resulted in the shutdown of numerous businesses and caused millions of American workers to be out of work. On March 13, 2020, the President declared a national emergency under Section 501 of the Robert T. Stafford

Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121 *et seq.* ("Stafford Act"). On March 18, 2020, the President signed into law the Families First Coronavirus Response Act ("FFCRA"), which provided additional flexibility for state unemployment insurance agencies and additional administrative funding to respond to the COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on March 27, 2020. The CARES Act expanded states' ability to provide unemployment insurance for many workers impacted by the COVID-19 pandemic. The CARES Act dedicated over $250 billion to give workers more access to unemployment benefits during the public-health emergency. The passage of the Continued Assistance Act on December 27, 2021, and then the American Rescue Plan Act on March 11, 2021, extended certain unemployment benefits to September 6, 2021.

21. Two of the principal ways in which the CARES Act expanded unemployment benefits during the pandemic was by (a) making those benefits available for those who had not traditionally qualified, such as contractors, self-employed, and gig workers; and (b) substantially increasing the amount of money paid to those who qualified for unemployment benefits.

22. As of April 18, 2020, the President had declared that a major disaster existed in all states and territories under Section 401 of the Stafford Act. On August 8, 2020, to further offset the pandemic impact on American workers, the President authorized the Federal Emergency Management Agency ("FEMA") to expend up to $44 billion from the Disaster Relief Funds for lost wage payments. The President authorized the FEMA Administrator to provide grants to participating states, territories, and the District of Colombia to administer delivery of lost wages assistance ("LWA") to those receiving unemployment insurance.

23. Unemployment compensation programs are essentially divided into the following four UI benefit components based upon the CARES Act, the Continued Assistance Act, the American Rescue Plan Act, and the FEMA LWA authorization (collectively "unemployment benefits"):

   a. *Federal Pandemic Unemployment Compensation Program ("FPUC")*: The CARES Act increased benefits for workers collecting UI by $600 per week for claims effective on or about March 29, 2020, through on or about July 31, 2020. The Continued Assistance Act reinstated FPUC at a reduced amount of $300 per week beginning on or about December 25, 2020. The Continued Assistance Act and the American Rescue Plan Act extended the benefits to on or about September 6, 2021.

   b. *Pandemic Unemployment Assistance ("PUA")*: The CARES Act expanded unemployment benefits for up to 39 weeks of benefits for individuals who did not qualify for traditional UI benefits, including the self-employed, independent contractors, and gig workers or those who were unemployed, partially employed, unable to work, or unavailable to work due to specific COVID-19 related reason(s). The PUA benefit expansion applied to weeks of unemployment beginning on or about January 27, 2020 through on or about December 31, 2020. The Continued Assistance Act and the American Rescue Plan Act extended FPUC from on or about December 26, 2020 to on or about September 6, 2021.

   c. *Pandemic Emergency Unemployment Compensation ("PEUC")*: The CARES Act provided up to 13 weeks of unemployment insurance benefits to those who

exhausted their eligibility; it applied to weeks of unemployment from on or about March 29, 2020 through on or about December 31, 2020. The Continued Assistance Act and the American Rescue Plan Act extended FPUC from on or about December 26, 2020 to on or about September 6, 2021.

d. *Lost Wages Assistance ("LWA"):* The FEMA LWA authorization provided an additional $300 per week to claimants in Virginia who were eligible for at least $100 per week in unemployment insurance compensation. For applicants in Virginia, LWA was automatically paid out in one lump sum of $1,800 on or about October 15, 2020 for six weeks of unemployment between on or about August 1, 2020 (soon after the $600-per-week PUA benefits expired), and on or about September 5, 2020, so long as the claimant had certified unemployment eligibility during that time period. LWA funds are federal monies, but their distribution was administered by VEC.

### *Economic Injury Disaster Loan*

24. Another source of relief provided by the CARES Act was an expansion of an existing disaster-related program: the Economic Injury Disaster Loan ("EIDL"). This program provides loan assistance, including $10,000 advances, for small businesses and other eligible entities for loans up to $2 million. The EIDL proceeds can be used to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the disaster not occurred; however, such loan proceeds are not intended to replace lost sales or profits or for expansion of a business.

25. Unlike certain other types of SBA-guaranteed loans, EIDL funds are issued directly from the United States Treasury and applicants apply through the SBA via an online portal and

application. The EIDL application process, which also uses certain outside contractors for system support, collects information concerning the business and the business owner, including, but not limited to, the following: (a) information as to the gross revenues for the business prior to January 31, 2020; (b) the cost of goods sold; (c) the number of employees; and (d) information regarding the criminal history of the business owner. Applicants electronically certify that the information provided is accurate and are warned that any false statement or misrepresentation to the SBA or any misapplication of loan proceeds may result in sanctions, including criminal penalties.

## COUNT ONE
(Subscribing to a False Tax Return)

26. The allegations contained in paragraphs 1 through 25 are realleged and incorporated as if fully set forth herein.

27. On or about March 17, 2022, in the Eastern District of Virginia, the defendant, KEVIN ALPHONSO STARLINGS, did willfully file and cause to be filed for himself a false and fraudulent 2021 Amended Form 1040, U.S. Individual Income Tax Return. That income tax return was false and fraudulent because it falsely reported that, throughout calendar year 2021, the defendant had made $192,479 in estimated tax payments and refundable credits, and was entitled to a $184,644 tax refund.

28. The defendant reported $192,479 in estimated tax payments and refundable credits included a reported $162,031 in purported W-2 federal withholdings, and a purported $22,226.00 in excess social security withholdings. In truth and in fact, and as he then knew, the defendant had

not made any federal withholdings (including excess social security) in calendar year 2021, and he was not entitled to a $184,644 tax refund.

29. The defendant's filing of false and fraudulent individual income tax returns to artificially inflate the refund due to him from the IRS was not limited to the 2021 calendar year.

30. For calendar years 2016 through 2022, the defendant filed and caused to be filed false Forms 1040 for himself falsely reporting, among other things, that the defendant's companies had withheld hundreds of thousands of dollars in federal tax from his income, and had paid over those funds to the IRS, thereby resulting in the defendant having purportedly overpaid his income taxes and being entitled to a refund. None of the defendant's companies made any withholding or payment of federal taxes to the IRS on the defendant's behalf, for calendar years 2016 through 2022—a fact that the defendant was well aware of. The defendant willfully and repeatedly executed this scheme to falsely report withholdings that had never been paid to the IRS for at least tax years 2016 through 2022. The objective of the defendant's tax fraud scheme was to obtain refunds from the IRS to which he was not entitled through materially false representations.

31. In total, between tax years 2016 and 2022, in the Eastern District of Virginia, the defendant willfully filed and caused to be filed for himself false and fraudulent Forms 1040 and Amended Forms 1040 claiming false withholding, causing the IRS to issue the following erroneous refunds:

| Tax Year | Return | False Withholding Amount | Fraudulent Refund Claimed | Corrected Tax Due | Total Additional Tax Due and Owing |
|---|---|---|---|---|---|
| 2016 | Form 1040 | $88,001 | $40,075 | $47,926 | $88,001 |
| 2017 | Form 1040 | $33,427 | $22,848 | $10,579 | $33,427 |

| Tax Year | Return | False Withholding Amount | Fraudulent Refund Claimed | Corrected Tax Due | Total Additional Tax Due and Owing |
|---|---|---|---|---|---|
| 2018 | Form 1040 | $41,351 | $26,907 | $14,444 | $41,351 |
| 2019 | Amended Form 1040 | $124,518 | $106,832 | $17,686 | $124,518 |
| 2020 | Form 1040 | $176,697 | $171,339 | $5,358 | $176,697 |
| 2021 | Amended Form 1040 | $184,257 | $184,644 | -$387 | $184,257 |
| 2022 | Form 1040 | $179,039 | $175,924 | $3,115 | $179,039 |
| **TOTAL** | | | | | **$827,290** |

(In violation of Title 26, United States Code, Section 7206(1)).

## COUNT TWO
(Wire Fraud)

32. The allegations contained in paragraphs 1 through 31 are realleged and incorporated as if fully set forth herein.

33. From in or about April 2020, and continuing through in or about at least September 2021, in the Eastern District of Virginia, the defendant, KEVIN ALPHONSO STARLINGS, knowingly devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, which scheme and artifice, and the execution thereof, operated in substance as follows:

### *The Scheme and Artifice*

34. The object of the defendant's scheme and artifice was to enrich himself by fraudulently obtaining COVID-19 relief funds to which he was not legitimately entitled through the submission of false and misleading applications to the SBA and state unemployment agencies,

resulting in the disbursement to the defendant of fraudulently-obtained EIDL loan proceeds and PUA/UI benefits by those financial institutions and the VEC, respectively.

35. It was part of the scheme and artifice that the defendant submitted a false and misleading PUA/UI application to the VEC to obtain unemployment benefits he was not entitled to receive.

36. Specifically, on or about April 10, 2020, the defendant submitted a UI application to the VEC. On this application, the defendant knowingly made several materially false and misleading representations about his employment history and current employment status, including, but not limited to, the following:

  a. Despite owning and operating Jeremiah Enterprises, Starlings Enterprises, The Service Sharks, ProSource Property Solutions, and Jeremiah Entertainment LLC at the time, and reporting on his tax return that he earned $628,450 in wages in 2020, the defendant falsely described his current employment status as not working and further stated that he recently received a notice of termination or military separation;

  b. The defendant falsely claimed that he was laid off, terminated, or separated from his employment on March 20, 2020, when, in fact, the defendant was still operating and self-employed at Jeremiah Enterprises, Starlings Enterprises, The Service Sharks, ProSource Property Solutions, and Jeremiah Entertainment LLC.

37. Before submitting the application to the VEC, the defendant falsely certified that the information on the application was true to the best of his knowledge, and he agreed to file the claim with the understanding that he could be fined and/or imprisoned if he knowingly failed to disclose information or gave false information in order to obtain or increase benefits.

38. On or about April 20, 2020, the defendant submitted a PUA application to the VEC. On this application, the defendant falsely represented that he was not self-employed or a business

owner. The defendant falsely claimed that he was no longer working, when, in fact, the defendant was still operating his various companies.

39. On the application, the defendant provided several reasons for his purported separation from his employer that were false and misleading. For instance, the defendant falsely claimed that he was scheduled to commence employment and did not have a job or was unable to reach the job as a direct result of the COVID-19 public health emergency and that his place of employment was closed as a direct result of the COVID-19 public health emergency. In reality, as the defendant then and there well knew, he reported on his tax return that he earned $628,450 in wages from his companies in 2020.

40. Before submitting the application to the VEC, the defendant falsely certified that all the information on the application was correct.

41. Relying on the false information in the defendant's PUA application, the VEC approved the defendant's fraudulent PUA application, and the VEC began disbursing benefit payments into the defendant's designated bank account.

42. It was further part of the scheme and artifice that the defendant would submit weekly recertifications of unemployment status to the VEC (and other state workforce agencies) for the PUA application he had submitted through September 2021, resulting in the disbursal of additional benefit payments into his bank account. These recertifications were knowingly and deliberately false. The defendant falsely claimed that he 1) was still unemployed, 2) had applied for employment with Jeremiah Entertainment and the Service Sharks and was awaiting a response; 3) had not received unemployment from other states, and 4) had not received any monetary

compensation. In reality, the defendant still owned and operated his businesses and reported for his 2021 tax returns that he earned $755,676 in wages from his businesses in 2021.

43. In addition to applying for UI/PUA benefits in Virginia, the defendant also submitted a fraudulent unemployment application to the North Carolina Division of Employment Security in or about July 2020. On this application, the defendant made several false representations including that he had not filed an unemployment claim with another state and falsely represented that he had been separated from Jeremiah Enterprises in March 2020. In reality, as the defendant then and there well knew, he had already applied for unemployment with the VEC, and he eventually reported on his tax return that he earned $628,450 in wages from his companies in 2020. The defendant concealed this information in order to deceive the North Carolina Division of Employment Security as to his eligibility for UI benefits, and to unjustly received benefit payments.

44. Ultimately, both the VEC and the North Carolina Division of Employment Security approved the false and misleading applications the defendant submitted on his own behalf. As a result of these fraudulent applications, the defendant received approximately $61,726 total in PUA/UI funds in his own name.

45. It was further part of the scheme and artifice for the defendant to submit false and misleading EIDL applications to the SBA. In total, the defendant submitted 11 EIDL applications for businesses he owned and operated.

46. Although the specific misrepresentations varied from application to application, the defendant's false statements and misrepresentations on the EIDL applications included, but were not limited to, the following:

      a. Providing false gross revenue and costs of goods sold figures for the businesses;

      b. Inflating or fabricating the employee count of the businesses; and

      c. Falsely certifying that the information in the applications was true and accurate.

47. Ultimately, most of the defendant's EIDL applications were rejected by the SBA, but in response to one of the fraudulent applications, the SBA disbursed $15,000 to a bank account designated by the defendant.

### *Wirings in Connection with the Scheme*

48. On or about August 16, 2021, for the purpose of executing the above-described scheme and artifice to defraud, and for the purpose of obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, the defendant knowingly filed a fraudulent and false unemployment weekly VEC recertification, thereby causing wire transmissions in interstate commerce, including wire transmissions of VEC's record of payments through their servers located in Sandston, Virginia, located in the Eastern District of Virginia, to the Truist/Suntrust server located in Atlanta, Georgia, instructing Truist/Suntrust to move money from the VEC Trust Fund account to a VEC Payments accounts to create an electronic transfer through ACH to the defendant's Varo bank account.

49. The aforementioned violation occurred in relation to, and involving a benefit authorized, transported, transmitted, transferred, disbursed, and paid in connection with a presidentially declared major disaster and emergency, as those terms are defined in Section 102 of the Stafford Act.

(In violation of Title 18, United States Code, Section 1343).

## FORFEITURE ALLEGATION

Pursuant to 32.2 of the Federal Rules of Criminal Procedure, the defendant is hereby notified that upon conviction of the offense charged in Count Two of this Criminal Information, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from any proceeds traceable to the offense. Property subject to forfeiture includes, but is not limited to:

> The sum of at least $76,762 which represents the amount of proceeds the defendant obtained from the offense charged in Count Two, which sum shall be reduced to a money judgment against the defendant in favor of the United States.

> If the property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461 and Title 21, United States Code, Section 853(p)).

Respectfully submitted,

Todd W. Blanche
Deputy Attorney General

Date: February 11, 2026       By: _____
                                  Carla Jordan-Detamore
                                  Assistant United States Attorney